1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10 | JOHNNY LEE MOORE, JR.,

CV F   07-00838 LJO DLB HC

11 |          Petitioner,

FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS

12 |     v.

13 | D. DEXTER,

[Doc. 1]

14

15 |          Respondent.
                                          /

16

17    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18 | pursuant to 28 U.S.C. § 2254.

### BACKGROUND

19

20    Following jury trial in the California Superior Court for the County of Stanislaus,

21 | Petitioner was convicted of carjacking (California Penal Code § 215)[1], misdemeanor assault, and

22 | the personal weapon use allegation was found true (§ 12022.53(b)).  (CT 138, 142-143.)  On

23 | December 22, 2004, Petitioner was sentenced to state prison for a total of fifteen years.  (CT

24 | 155.)

25    Petitioner filed a timely notice of appeal.  On March 20, 2006, the California Court of

26 | Appeal, Fifth Appellate District affirmed the judgment.  (Lodged Doc. D.)

27    Petitioner then filed a petition for review in the California Supreme Court, which was

28

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1

1    denied on May 24, 2006.  (Lodged Docs. E, F.)

2        Petitioner filed the instant federal petition for writ of habeas corpus on June 1, 2007, in

3    the Sacramento Division of this Court.  The petition was transferred to this Court on June 8,

4    2007.  Respondent filed an answer to the petition on September 18, 2007, and Petitioner filed a

5    traverse on October 16, 2007.  (Court Docs. 10, 13.)

6                                    STATEMENT OF FACTS

7        On June 3, 2004, Karama Morris, accompanied by Norman Bobino, drove his 1979 Capri

8    classic to a nightclub in Modesto, California for a concert.  (RT 9.)  They arrived in Modesto at

9    approximately 11:15 that evening, and Morris parked his vehicle in parking garage adjacent to

10   the nightclub.  (RT 22.)  The two left the nightclub at approximately 1:30 a.m., the next morning.

11   (RT 32.)  They walked directly to the parking garage and as Morris started the engine of his car

12   and while both doors to the vehicle were open, he heard footsteps approaching, and when he

13   looked up he observed Petitioner and another individual running toward his vehicle.[2]  (RT 10-13,

14   34.)  Petitioner was holding a black handgun and as he cocked the gun he told Morris in an

15   aggressive tone "Come up out of your seat, get on the ground, or I'll shoot you."  (RT 11, 36.)

16   Morris observed Petitioner's partner approach the passenger side of the vehicle and made Mr.

17   Bobino take off his jeans and shoes and then began "tasing" him.  (RT 12, 36, 40.)  He could see

18   the electricity and hear Bobino screaming.  (RT 13.)  Petitioner took Morris' wallet and both men

19   drove away with his car.  (RT 13.)  Petitioner's cell phone was also taken from the pocket of

20   Bobino's jeans.  (RT 68, 103.)

21       The two exited the parking garage and flagged down a police officer.  (RT 14, 42.)

22   Morris told Officer Ramirez that Petitioner had gold teeth, and he described Petitioner's crime

23   partner.  Morris told Ramirez that the two assailants looked like men he had seen before in

24   Oakland.  (RT 204, 212-213.)  Morris told the officer that he observed the two men outside of the

25   nightclub that evening.  (RT 43-44.)  Morris described the individual with the handgun as black,

26   five eight with dreadlocks, and slim build with gold teeth.  (RT 13, 59.)

27   _____

28       [2] Morris positively identified Petitioner as the assailant with the gun and drove away with his vehicle.  (RT 10-12, 34, 55-56.)

                                              2

1    Petitioner stated that some women who had been in the nightclub that evening gave him

2  and Mr. Bobino a ride home that night.  (RT 44.)

3    At approximately 8:00 a.m. that morning, Morris received a phone call from his cousin,

4  Tasha, who told him that she just saw someone driving his vehicle down San Pablo street in

5  Oakland.  (RT 72.)  She said there were two people in the car, with a female in the back, and the

6  music was turned up "real loud."  (RT 72.)  She was able to observe that the keys were in the

7  ignition.  (RT 72.)  Morris woke up his brother Jamala, who drove to North Oakland to look for

8  the vehicle, while Morris stayed home to wait for the police to call him.  (RT 73-77.)

9    Morris received another phone call from his cousin, Moe, who too said that he observed

10  the vehicle traveling in Oakland.  (RT 80, 82.)  Shortly after arriving in Oakland, Jamala,

11  observed Petitioner driving Morris' vehicle on 55th Avenue.  (RT 82-83, 113.)  Jamala called

12  Morris while he and Moe were following the car, and told him to call the police, which he did.

13  (RT 83-85, 89.)

14    As Jamala was following the vehicle, he observed Petitioner stop at an auto body shop,

15  get out and speak with someone making gestures toward the vehicle; he then got back into the car

16  and drove to 63rd Street.  (RT 113-115.)  Petitioner meet up with Jones, his codefendant at trial,

17  and the two of them got into a Buick vehicle and drove away.  (RT 115.)  During this time,

18  Jamala made contact with the police department and advised them of his location.  (RT 116.)

19  Jamala proceeded to follow the Buick to a Orchard Supply store at Ashby Plaza in Berkeley.

20  (RT 116.)  Police officers arrived at the location and apprehended both Petitioner and Jones.  (RT

21  116, 124, 162-163, 165-166.)  During a search of Petitioner, police recovered the keys to Morris'

22  vehicle from his pocket.  (RT 115-118.)

23    Morris was subsequently notified by the police that the two assailants were apprehended

24  and he could pick up his vehicle, which was located approximately four blocks from the place of

25  arrest.  (RT 90, 118, 163-164.)  A set of custom speakers were taken from the vehicle.  (RT 99.)

26  Morris was asked to go to the police station in Oakland to view a lineup; however, he was unable

27  to do so.  (RT 96-97.)  Therefore, Modesto Police Officer Gary Guffey went to Morris' home that

28  evening and showed him two photograph lineups.  (RT 98-99.)  Morris positively identified

3

1   Petitioner as the individual who assaulted him with the gun in the parking garage and drove away

2   with his vehicle.  Morris told the officer that based on information he received he believed

3   Petitioner's name was "Johnny."  (RT 171-174, 190.)  Morris also positively identified Jones as

4   the person who tased his friend.  (RT 98-99, 102.)

5   Defense

6          Officer Ramirez interviewed Morris on the night of the incident.  Morris told him that

7   Bobino was tased inside of the car, as opposed to outside of the car.  (RT 200.)  Morris said that

8   he was in the driver's seat while Mr. Bobino was being tased in the passenger's seat.  (RT 221.)

9   Both were subsequently ordered out of the car.  (RT 224-225, 228.)  Morris did not tell Ramirez

10  that Mr. Bobino's pants or shoes had been stolen.  (RT 201, 209.)  Nor did he indicate that his

11  cell phone had been stolen.  (RT 209.)

12         Ramirez testified that a taser shoots out bars or little wires, and makes the individual

13  seize up and drop to the ground with just one shot and leaves them stunned.  (RT 206, 222.)  He

14  stated that neither Morris or Bobino appeared dirty, disoriented, disheveled, or wounded.  (RT

15  201.)  Morris told Ramirez that he had seen both assailants before, and particularly he saw

16  Petitioner in Oakland, but did not know his name.  (RT 204, 212-213, 216.)

17         Petitioner's grandfather, Bradley Dodson, testified that on June 2 and 4, 2004, Petitioner

18  lived in a converted studio apartment in the garage adjacent to his home.  (RT 233.)  On the night

19  of the incident, he recalled seeing Petitioner around 12:00 or 12:15, entering the gate to go to his

20  apartment.  (RT 234.)  In order to enter Petitioner's apartment, he had to pass the kitchen window

21  of Dodson's home.  (RT 234.)  Dodson acknowledged that he never said anything previously

22  about Petitioner being home on the night of the incident.  (RT 245.)

23         He indicated that Petitioner was arrested twice on the instant charges, and the charges

24  were dropped the first time.  (RT 241.)  In addition, he acknowledged that Petitioner had

25  dreadlocks at the time of his arrest, and he had seen Jones associating with Petitioner in the past.

26  (RT 242.)

27  ///

28  ///

4

DISCUSSION

A.      Jurisdiction

        Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Stanislaus County Superior Court, which is located within the jurisdiction of this

Court.  28 U.S.C. § 2254(a); 2241(d).

        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

        The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States;" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State Court

5

1    proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

2    the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

3    Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

4    because that court concludes in its independent judgment that the relevant state-court decision

5    applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

6    omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

7           While habeas corpus relief is an important instrument to assure that individuals are

8    constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

9    (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

10   criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

11   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

12   factual determinations must be presumed correct, and the federal court must accept all factual

13   findings made by the state court unless the petitioner can rebut "the presumption of correctness

14   by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

15   S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

16   110 F.3d 1380, 1388 (9th Cir. 1997).

17   C.      Instructional Error

18          Petitioner contends that the trial court erred in denying his request for special instructions

19   regarding (1) the absence of "normally expected" circumstantial evidence and (2) the loss of a

20   police report, giving rise to a Sixth Amendment violation.

21          A challenge to a jury instruction solely as an error under state law does not state a claim

22   cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

23   A petitioner's burden is especially heavy when a claim is based on the omission of an instruction

24   because no erroneous instruction was given.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  An

25   omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

26   law.  Id.  The significance of the omitted instruction is evaluated by a comparison with the

27   instructions that were given.  Id. at 156; Murtishaw v. Woodford, 255 F.3d 926, 971 (9th

28   Cir.2001).

1          A.       Circumstantial Evidence Instruction

2          The trial court denied Petitioner's request to give the following special instruction

3    regarding circumstantial evidence:

4              The absence of evidence you would normally expect to find in a
        prosecution based on circumstantial evidence may be considered by you along
5        with all other proved facts in deciding the question of guilt or innocence.  The
        weight to be given this absence of evidence is a matter for you to determine.
6

7    The trial court found this instruction was not warranted because the instant case was "not

8    primarily a circumstantial case."  (CT 86.)

9          In denying Petitioner's claim in the last reasoned state court opinion,[3] the Court of Appeal

10   held, in pertinent part, as follows:

11              As the trial court noted in rejecting [Petitioner's] proposed instruction, this
        was "not primarily a circumstantial case."  Unlike *Blakeslee* and *Hall*, defendant
12       was directly identified as the perpetrator by a victim eyewitness.  In addition, the
     victim's brother directly observed [Petitioner] driving the victim's car the morning of the
13   carjacking.  Further, it is undisputed that the victim's car keys were recovered from [Petitioner's]
     pocket by a police officer as he was arrested in the company of the person the victim identified as
14   the second assailant in the carjacking.  Thus, in contrast with *Blakeslee* and *Hall*, the prosecution
     here presented strong direct evidence, as well as circumstantial evidence, connecting [Petitioner]
15   to the commission of the crimes.

16              [Petitioner] has cited no authority to support his suggestion the
        prosecution was required to find and present all evidence that would ordinarily be
17       expected to exist if the testimony of the eyewitnesses were true, such as evidence
        of the gun [Petitioner] used, a parking ticket showing Karama parked where he
18       claimed the carjacking occurred, or calling Bobino to testify.  Indeed, there is even
        a jury instruction that addresses this issue and was properly given in this case:
19       "Neither side is required to call as witnesses all persons who may have been
        present at any of the events disclosed by the evidence or who may appear to have
20       some knowledge of these events. [¶]  Neither side is required to produce all
        objects or documents mentioned or suggested by the evidence."  (CALJIC NO.
21       2.11; *People v. Stanley* (1967) 67 Cal.2d 812, 820.)

22              ........................................................................................

23              We also reject the notion that the court's refusal to give the requested
        instruction somehow deprived [Petitioner] of the ability to present a defense.  To

24

25       [3] Because the California Supreme Court's opinion is summary in nature, however, this Court "looks
26   through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to
     have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d
27   706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's
     reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th
28   Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's
     rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

1    the extent [Petitioner] is arguing that Karama and Jamala, the victim and the
     victim's brother, were not credible witnesses and that the remaining
2    circumstantial evidence was insufficient to support a guilty verdict, this was a
     theory that the defense could and did develop in closing argument.  Furthermore,
3    requiring the court to give an instruction which might have suggested that an
     eyewitness's account had to be supported by normally expected circumstantial
4    evidence would have run counter to the settled principle that "[p]urported
     weaknesses in identification testimony are to be evaluated by the jury [citation]
5    and the testimony of a single eyewitness, if not inherently incredible, is sufficient
     to support a verdict. [Citation.]" (*People v. Keltie* (1983) 148 Cal.App.3d 773,
6    781-782.)  For all these reasons, we find the court did not err in refusing to give
     the requested instructions.

7

8    (Lodged Doc. D, Opinion, at 5-7, 8.)

9        To the extent Petitioner argues that the trial court erred under California law by failing to

10   give the instruction, the claim is not cognizable via section 2254.  Even if Petitioner's claim can

11   be construed as giving rise to an alleged constitutional violation, the state courts' determination

12   of this issue was not contrary to, or an unreasonable application of, clearly established Supreme

13   Court precedent.  This Court is bound by the state courts' interpretation of California law in

14   finding that an instruction based on the holdings in People v. Hall and People Blakeslee was not

15   warranted.  This finding is not contrary to or an unreasonable application of clearly established

16   Supreme Court authority.  First, Petitioner does not cite any clearly established Supreme Court

17   authority which requires a special instruction based on the absence of circumstantial evidence

18   which would normally be expected to have been presented by the prosecution.  Even if so, as

19   found by the state courts, the evidence in this case did not warrant such instruction.  To the

20   contrary, there was solid evidence to support the carjacking conviction, as Petitioner was

21   observed driving the vehicle the morning of the carjacking, he was found in possession of the car

22   keys along with the second assailant, and he was positively identified by Morris as the individual

23   who brandished a gun and demanded the car.  In light of the strong direct evidence, the state

24   courts' determination that this case was not based primarily circumstantial evidence alone was

25   not objectively unreasonable.  In addition, as pointed out by the state appellate court, to the

26   extent the defense believed that certain necessary evidence was not presented, the defense was

27   free to develop such issue through evidence and argument, as was done in this case.

28       B.    Missing Police Report Instruction

8

1    Norman Bobino was interviewed by Modesto Police Officer Tyler, after the carjacking.

2  (RT 199.)  During trial, Petitioner requested that the jury be instructed that Officer Tyler's report

3  of the interview with Bobino had been lost or not disclosed.  (RT 229-230.)  The trial court

4  denied the request stating, "Nobody called this witness and so whether the police report became

5  lost or otherwise unavailable is totally irrelevant as far as I'm concerned.  So the jury gets

6  instructed nothing about that."  (RT 230.)  In the last reasoned state court opinion,[4] the Court of

7  Appeal denied the claim as follows:

8        We likewise reject [Petitioner's] contention the court erred by refusing to
      give "some instruction to the jury to the effect that the police report was prepared
9      and simply not disclosed.  And the jury can make up their own minds as to what
      happened to it.  "Defense counsel made this request after Officer Ramirez
10     testified.  In his testimony, Officer Ramirez indicated that Officer Tyler had
      prepared a report of his interview with Bobino.  Although the parties indicated
11     they were willing to stipulate Officer Tyler's report had subsequently been "lost,"
      the trial court did not accept the stipulation.  Instead, the trial court sustained the
12     prosecutor's relevancy objection to Officer Ramirez's testimony regarding Officer
      Tyler's report and struck all his testimony on the subject.

13
        [Petitioner] did not object to the court's evidentiary ruling and only
14     challenges the court's relevancy determination to support his claim of
      instructional error.  However, because the court's evidentiary ruling removed the
15     matter from the jury's consideration, it would have been manifestly improper to
      give an instruction on Officer Tyler's report or absence thereof.  Moreover, for the
16     reasons discussed above, we reject [Petitioner's] argument that under *Hall* and
      *Blakeslee* an instruction on the absence of Officer Tyler's report was required
17     because it "fit with the defense case that there was an absence of evidence that
      would normally expected to be in the prosecution's case."

18
        We also reject the notion that the court's refusal to give the requested
19     instruction somehow deprived [Petitioner] of the ability to present a defense.  To
      the extent [Petitioner] is arguing that Karama and Jamala, the victim and the
20     victim's brother, were not credible witnesses and that the remaining
      circumstantial evidence was insufficient to support a guilty verdict, this was a
21     theory that the defense could and did develop in closing argument.  Furthermore,
      requiring the court to give an instruction which might have suggested that an
22     eyewitness's account had to be supported by normally expected circumstantial
      evidence would have run counter to the settled principle that "[p]urported
23     weaknesses in identification testimony are to be evaluated by the jury [citation]
      and the testimony of a single eyewitness, if not inherently incredible, is sufficient

24

25        [4] Because the California Supreme Court's opinion is summary in nature, however, this Court "looks
26  through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to
   have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d
27  706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's
   reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th
28  Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's
   rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

9

1   to support a verdict. [Citation.]" (*People v. Keltie* (1983) 148 Cal.App.3d 773,
2   781-782.)  For all these reasons, we find the court did not err in refusing to give
    the requested instructions.

3   (Lodged Doc. D, Opinion, at 7-8.)

4        As with Petitioner's prior claim, the state courts' determination of this issue was not

5   contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

6   Because neither Bobino nor Officer Tyler testified at trial, Tyler's report was not relevant to any

7   of the issues before the jury.  Accordingly, the contents of Tyler's report of the interview with

8   Bobino was not established by the evidence, and any instruction as to the reports whereabouts

9   was not warranted.  Thus, the omission of this instruction could not and did not have a

10   "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

11   Abrahamson, 507 U.S. at 638; Calderon v. Coleman, 525 U.S. 141, 145-147 (1998).

12   D.     Insufficient Evidence to Support Conviction

13        Petitioner contends that there was insufficient evidence to support his convictions for

14   carjacking, misdemeanor assault, and personal use of a weapon enhancement.

15        The law on insufficiency of the evidence claim is clearly established.  The United States

16   Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

17   federal court must determine whether, viewing the evidence and the inferences to be drawn from

18   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

19   elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

20   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

21        Section 215 establishes these elements for the crime of carjacking: (1) taking a vehicle

22   possessed by another; (2) from the presence of the possessor or a passenger; (3) "against his or

23   her will"; (4) with intent to deprive possession; and (5) and, by means of force or fear.  People v.

24   Hill, 23 Cal.4th 853, 862 (2000).  The enhancement provisions of section 12022.53(b), apply to

25   "any person who, in the commission of [a carjacking[5]], personally uses a firearm . . . ."

26        The evidence established that Petitioner approached Morris' vehicle armed with a

27

28   _____

     [5]  See section 12022.53(a)(5).

10

1   handgun, threatened to shoot Morris if he did not get out of the vehicle, and then drove off with

2   the vehicle. (RT 10-14, 38-39, 67-69.)  The day after the carjacking, Petitioner was observed

3   driving the vehicle and the keys were subsequently recovered from his pocket.  (RT 115-118.)

4   Morris had previously seen Petitioner in Oakland, and he positively identified him from a

5   photograph lineup the day after the crime and identified him at trial.  (RT 11, 14-15, 98-99, 102,

6   171-174.)  Based on this evidence, a rational trier of fact could and did find the essential

7   elements of carjacking beyond a reasonable doubt.  Petitioner goes on at length about

8   inconsistencies and alleged falsities in the witnesses testimony; however, the weight and

9   credibility to give to the testimony was solely the determination of the jury.  United States v.

10  Delgado, 357 F.3d 1061, 1068 (9th Cir. 2004) ("the credibility of witnesses is a question for the

11  jury, unreviewable on appeal.")

12          Although Petitioner points to certain inconsistencies such as different version of

13  descriptions of the gun, whether the car was running at the time of the attack or whether the key

14  was in the ignition, lack of injury to Mr. Bobino from the tasing, whether the tasing took place

15  inside or outside of the vehicle, whether Morris knew only Petitioner or both assailants, and

16  whether Morris and Bobino were given a ride from a women at the nightclub or made a phone

17  call to someone to pick them up. (See Petition, at pp. 19-24.)  The bulk of these inconsistencies

18  involve ancillary details and do not undermine the jury's finding that the witnesses were credible.

19   Consequently, the inconsistencies in the witnesses testimony are not significant enough to render

20  Petitioner's conviction inherently improbable, given the other consistent evidence supporting his

21  guilt.

22          The jury could also rationally find that Petitioner personally used a firearm to accomplish

23  the carjacking.  Moreover, the brandishing of the firearm along with the threat of force, rationally

24  supports the jury's finding that Petitioner was guilty of assault which is defined as an unlawful

25  attempt, coupled with a present ability, to commit a violent injury on the person of another.  §

26  240.  As there was sufficient evidence to support each of Petitioner's convictions, the claim is

27  without merit.

28  E.      Batson Challenge

11

1    Petitioner contends that the trial court erred in denying his Batson motion giving rise to a

2  due process violation.

3        1.      Background/State Court Disposition

4    During jury selection, the prosecution exercised a peremptory challenge against Juror

5  Johnson who was African American.  (SRT[6] 35, 48.)  Defense counsel objected to the use of the

6  peremptory challenge under People v. Wheeler, 22 Cal. 3d 258 (1978).[7]  The following exchange

7  took place:

8        MR. MARTIN [defense counsel]: Yes, Your Honor.  I would object to Mr.
   Johnson being excluded.  He didn't say anything I thought that showed any bias or
9    favoritism towards anyone in this case, that there were other jurors that spoke of a
   more positive nature with respect to believing police officers and the like.  And I
10   wonder why if the man is neutral and didn't say anything other than he was a
   pastor and a single dad raising kids, why he would be bumped just because he was
11   a pastor.  Granted not four people have been bumped, we only have one; and
   that's grounds in and of itself.  It just struck me that he was the first one.
12       THE COURT: So you're basically making a motion based on the Wheeler
   case; is that correct?
13       MR. MARTIN: Yes.
       THE COURT: Mr. Phipps, do you wish to be heard on the matter?
14       MR. PHIPPS [prosecutor]: Yes. I do, Your Honor.  My victim in this
   matter in this case is black; and I was somewhat gratified to have a black person
15   on the panel because I thought that he could possibly relate very well to my
   victim.
16       But in this case this gentlemen said that he's a pastor.  I've had experience
   in the past with letting a pastor stay on the jury, hung up the jury; and I would
17   never intentionally leave a pastor on the jury again after that experience.
       THE COURT: You think they have a problem finding - - voting guilty; is
18   that what you're saying?
       MR. PHIPPS: Yes, the evidence in that case I"m talking about there was
19   no doubt about what had happened, and it was his particular profession that
   caused the result.
20       THE COURT: Anything further?
       MR. BAKER [defense counsel]: I guess, Your Honor, I'd like to join Mr.
21   Martin's motion.  I'd like to add to it that not only is he the only African
   American in the jury box, he's the only African out of a hundred or so in the pool
22   here.

23  (SRT 47-49.)

24    In denying the defense motion, the trial court held:

25       THE COURT: Ordinarily, I would say excluding one African American

26  ─────────────────────

27     [6]  "SRT" refers to the supplemental reporter's transcript of the voir dire proceedings.

28     [7]  Under California law, People v. Wheeler, is the procedural equivalent of Batson v. Kentucky, 476 U.S.
   79, 89 (1986).  See McCain v. Prunty, 217 F.3d 1209, 1216 n.2 (9th Cir. 2000).

1  from a jury panel would not generally trigger any alarm bells in my head and I
   probably wouldn't even go so far as to hold a hearing on the Wheeler motion
2  except for the fact that Mr. Johnson was the only African American on the panel
   and the first person to be challenged.
3          MR. PHIPPS: First one to be properly challenged.
           THE COURT: That's true.  I forgot you tried to first excuse Mr. Eaton.  I
4  forgot about that. [¶] In any event, I'm going to find there was an independent
   reason for this.  I also note in this particular situation that not only are the
5  Defendants but also the alleged victims are African American and so I think it's in
   a large sense a kind of a race neutral situation.  And given that the - - Mr. Phipps'
6  stated feeling that pastors of whatever religious denominations tend to be difficult
   for - - to vote guilty in cases, I'm going to overrule the objection and sustain the
7  challenge.

8  (SRT 49-40.)

9          In denying Petitioner's claim in the last reasoned state court, the Court of Appeal held, in

10 pertinent part as follows:

11         Because the [trial] court essentially asked the prosecutor to explain his use
   of the peremptory challenge, we need not address the question whether a prima
12 facie showing in fact had been made. [Citation.] Consequently, we will skip the
   first step of the *Batson* analysis and instead will assume as the court did that the
13 defense's showing was adequate.
           The prosecutor stated a race-neutral reason for excusing the juror in
14 question, and thereby satisfied step two of *Batson*. . . .
           The court, as set out above, accepted the prosecutor's reason for excusing
15 the juror in question and thereby impliedly found that the defense had failed to
   prove purposeful racial discrimination.  The validity of that finding is the issue in
16 this case.
           ............................................................................................................
17         [Petitioner] asserts that the trial court improperly determined that the
   "federal constitution's protections did not apply if the race of the victim and the
18 defendant and the excluded juror are the same . . . ."  We reject [Petitioner's]
   assertion.  It is clear from the record that the court was simply evaluating the
19 truthfulness of the prosecutor's explanation and not, as [Petitioner] asserts,
   finding the evaluation race neutral "as a matter of law."
20         [Petitioner] further claims that the record does not support the
   prosecution's justification for excluding Juror J. because there was no evidence
21 affirmatively demonstrating that, as a pastor, he would have trouble reaching a
   guilty verdict or that all pastors have trouble reaching guilty verdicts.
22 [Petitioner's] argument misses the point.  What the prosecutor must show is a
   race-neutral reason, regardless of its plausibility, for excusing the juror. (*Purkett*,
23 *supra*, 514 U.S. at pp. 767-768.)  The trial court then must assess the validity of
   the reason, which the court did in this case.
24         Moreover, there is support in the record for the prosecutor's reason.  In
   response to the court's questions regarding his background, Juror J. stated that he
25 was a pastor and provided in-home support to elderly and sick people.  When
   asked whether he was a pastor of a particular church, Juror J. responded, "No, I
26 just do a lot of jumping from church to church."  Contrary to [Petitioner's]
   suggestion, the prosecutor was not required to prove Juror J. was actually biased
27 against the prosecution to meet the defense's *Wheeler-Batson* challenge.
   [Citation.]  Thus, we reject [Petitioner's] arguments to the effect that the
28 prosecutor did not develop a sufficient record to show his justification for

1   excluding Juror J. was race neutral.
2        Finally, we reject [Petitioner's] argument that Juror J. was improperly
    challenged based on his religion.  In the cases [Petitioner] cites, peremptory
3   challenges to prospective jurors who stated they were affiliated with a religion and
    that their religious views might impact their ability to judge the case were found
    not to violate *Wheeler*. [Citations.]
4        In this case, the prosecutor stated that he exercised a peremptory challenge
    to Juror J. because he said he was a pastor, and, in the prosecutor's experience,
5   people employed as pastors have difficulty returning guilty verdicts.  Juror J. was
    therefore not excluded from the jury panel because of his religion.  Rather, we do
6   not know with what religion Juror J. was affiliated.  All we know is that Juror J.
    claimed to be a pastor who jumped from church to church.  Thus, this case is
7   analogous to the cases cited above in which challenges based on the juror's
    profession were found to be proper. . . .
8        Here, it was apparently the prosecutor's belief that a pastor would be
    sympathetic to the [Petitioner].  This is no different than excusing social workers
9   and kindergarten teachers because, in the prosecutor's experience, they have
    similar sympathies.  We therefore conclude that the prosecution did not
10  impermissibly excuse Juror J.

11  (Lodged Doc. D, Opinion, at 11-15.)

12      2.   Analysis

13  Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal

14  and state trials is governed by the standard established by the United States Supreme Court in

15  Batson v. Kentucky, 476 U.S. 79, 89 (1986).  In Batson, the United States Supreme Court set out

16  a three-step process in the trial court to determine whether a peremptory challenge is race-based

17  in violation of the Equal Protection Clause.  Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769

18  (1995).  First, the defendant must make a *prima facie* showing that the prosecutor has exercised a

19  peremptory challenge on the basis of race.  Id.  That is, the defendant must demonstrate that the

20  facts and circumstances of the case "raise an inference" that the prosecution has excluded venire

21  members from the petit jury on account of their race.  Id.

22  If a defendant makes this showing, the burden then shifts to the prosecution to provide a

23  race-neutral explanation for its challenge.  Id.  At this step, "the issue is the facial validity of the

24  prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's

25  explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S.

26  352, 360, 111 S.Ct. 1859  (1991).  Finally, the trial court must determine if the defendant has

27  proven purposeful discrimination.  Id. at 359.  The Supreme Court has made clear that "the

28  ultimate burden of persuasion regarding racial motivation rests with, and never shifts from the

1   opponent of the strike." Purkett v. Elem, 514 U.S. at 768; Rice v. Collins, 546 U.S. 333, 126

2   S.Ct. 969, 974 (2006).

3          "When there is reason to believe that there is a racial motivation for the challenge, neither

4   the trial courts nor we are bound to accept at face value a list of neutral reasons that are either

5   unsupported in the record or refuted by it." Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir.

6   1993).  The court must consider the record as a whole and each explanation in order to determine

7   whether an invidious discriminatory purpose may be inferred from the totality of the relevant

8   facts of the case. Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006) (citing Hernandez, 500

9   U.S. at 363.)

10         As properly recognized by the state appellate court, the only inquiry in this case is step-

11  three of the Batson analysis, i.e. whether Petitioner demonstrated purposeful discrimination.

12  Here, the trial court found, and the Court of Appeal agreed, that the prosecutor's stated non-racial

13  reasons for the peremptory challenge were credible.  Petitioner has failed to point to any evidence

14  to the contradict or rebut such finding.  The prosecutor stated, the reason for the challenge was

15  based on his prior experience in having a pastor serve on a jury that hung on making a guilty

16  finding.  (SRT 48.)  The prosecutor stated in unequivocal terms that the reason for the "hung

17  jury" was due to the fact of the juror's profession as a pastor.  (Id.)  Contrary to Petitioner's

18  assertion, the stated reason was the juror's occupation as a pastor, not his religion, which has

19  routinely been found to be a credible non-racial basis to utilize a peremptory challenge.[8] See e.g.

20  J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 143 n.14 (1994) (peremptory challenges based on

21  status of occupation do not raise the same level of concern as based on race or gender); United

22  States v. Cruz-Escoto, 476 F.3d 1081, 1089-1090 (9th Cir. 2007) (juror's status as unemployed

23  held to be a race-neutral explanation for use of peremptory challenge); United States v.

24  Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987) (acknowledging that excluding jurors based on

25  profession is wholly within the prosecutor's prerogative); Hall v. Leubbers, 341 F.3d 706, 713

26  (8th Cir. 2003) (occupation is a permissible reason to defend against a Batson challenge).

27

28         [8] In fact, the juror's actual religion was not disclosed.  (See SRT 35.)

15

1   In sum, because the prosecutor struck the questioned juror on the basis of his occupation

2   as a pastor, the equal protection principles of Batson and its progeny simply do not call into

3   question such challenge.  Petitioner has not identified and the Court has not found anything in the

4   record to contradict the prosecutor's non-racial reason or to question the credibility of the

5   prosecutor.[9]  Therefore, the state courts' determination of this issue was not contrary to, or an

6   unreasonable application of, clearly established Supreme Court precedent.

7                                        RECOMMENDATION

8   Based on the foregoing, it is HEREBY RECOMMENDED that:

9   1.      The instant petition for writ of habeas corpus be denied; and,

10  2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

11  This Findings and Recommendation is submitted to the assigned United States District

12  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

13  the Local Rules of Practice for the United States District Court, Eastern District of California.

14  Within thirty (30) days after being served with a copy, any party may file written objections with

15  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

16  Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

17  and filed within ten (10) court days (plus three days if served by mail) after service of the

18  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

19  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

20

21      [9] In Kesser v. Cambra, 465 F.3d 351 (9th Cir. 2006) , the Ninth Circuit applied comparative analysis for the first time on appeal stating that the California Court of Appeal failed "to consider comparative evidence in the record

22  before it [which] undeniably contradicted the prosecutor's purported motivations, [and] unreasonably accepted his nonracial motives as genuine." Id. at 357.  In applying comparative analysis, the Ninth Circuit held that

23  "comparative analysis is required even when it is not requested or attempted in state court." Id. at 361.  It went on to state that

24          The [Supreme] Court in *Miller-El* applied comparative juror analysis to a case originally
            tried in 1986, remanded for a Batson hearing in 1988, and appealed under AEDPA in 2000.  The

25          Court's holding means that the principles expounded in *Miller-El* were clearly established
            Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court

26          decision in *Miller-El*, handed down in 1992, before Kesser's 1993 trial.

27  Id. at 360.

28      Comparative analysis is not beneficial in the instant case, as the reason for the dismissal is isolated and unique to only Mr. Johnson.

1   may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

2   Cir. 1991).

3

4        IT IS SO ORDERED.

5        **Dated:**   **May 29, 2008**              <u>         /s/ **Dennis L. Beck**         </u>
                                                    UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28